# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>NERY'S USA, INC., a Nevada corporation, JOHN CATHCART, an individual and COMMERCIAL TARGA, S.A. DE C.V., a Mexican corporation,<br><br>                    Defendants. | Case No.: 3:11-cv-1589-JM (WVG)<br><br>**STATEMENT OF DECISION PURSUANT TO RULE 52** |
| NERY'S USA, INC., a Nevada corporation,<br><br>                    Counterclaimant,<br><br>          v.<br><br>GENESIS MERCHANT PARTNERS, LP., a Connecticut corporation,<br><br>                    Counterdefendant. | |

## INTRODUCTION

On July 18, 2011, Genesis filed suit against Defendants Nascent Wine Company, Inc. ("Nascent"), Commercial Targa ("Targa"), and John Cathcart

(together "Defendants") for Nery's' failure to make payments due to Genesis under a $1.85 million promissory note ("Second Note") issued by Nery's and guaranteed by Targa. Nery's issued the Second Note to Nascent in exchange for its purchase of Targa, which Nascent owned at that time. Nascent then assigned the Second Note to Genesis to satisfy its obligation on another promissory note ("First Note") that it had issued to Genesis for $1 million. Genesis asserted three claims against all defendants: (1) breach of contract, (2) unjust enrichment, and (3) and negligent misrepresentation. Genesis also asserted a conversion claim solely against Nery's.

On August 19, 2011, Nery's filed both a third-party complaint against Nascent and a counterclaim against Genesis. The third-party complaint alleges that Nascent failed to disclose pertinent information about Targa's tax debt to the Mexican government prior to the SPA's signing. Nery's claims that the undisclosed debt prevented Targa from obtaining a loan and severely limited its ability to do business. This court granted Genesis' motion to dismiss Nery's' counterclaim on January 6, 2012 because it made no separate factual allegations, was almost identical to the third-party complaint and requested only declaratory relief.

On September 7, 2012, Defendants filed a motion for summary judgment, which this court denied as to the breach of contract and unjust enrichment claims, but granted for the negligent misrepresentation and conversion claims. The court also granted the motion for summary judgment filed on behalf of Defendant Cathcart.

The parties have acknowledged that federal jurisdiction and venue are properly before this court. This Court has diversity jurisdiction of this action

pursuant to 28 U.S.C. §1332, and venue exists under 28 U.S.C. §1391(a), (d), and (f). California state substantive law applies to the cause of action alleged in Genesis' Complaint and Nery's third-party complaint.

A five-day trial began on July 24, 2013 and concluded on July 2, 2013, with Genesis insisting that it was entitled to damages and Nery's requesting rescission of its contract purchasing Targa. The court has determined that Nery's request for rescission should be granted, rendering it unnecessary for the court to address Genesis' damage claims.

## FINDINGS OF FACT

Genesis is a Delaware Corporation that operates as a private equity or investment fund. As part of its portfolio, Genesis makes loans to businesses.

Nascent, a publicly traded company, owned and operated various food service distributor companies. Between 2006 and 2008, Nascent acquired nine companies, including Commercial Targa, S.A. DE C.V. ("Targa"), a Mexican corporation, in October 2007. Targa was a cheese distribution company in Northern Baja, Mexico, which sold cheese under the brand name "Nery's." The Nery's brand name had been developed over 25 years by a family business in Northern Baja, Mexico. Targa also held three Mexican permits, including a permit to import cigarettes, as well as its "cut-and-wrap" facility and equipment.

When Nascent acquired Targa in 2007, Targa had sales of approximately $7 million with a net profit of $1.2 million with its principal market in Northern Baja. By the latter half of 2008, however, sales were declining and capital was insufficient to push the Nery's brand name nationwide through Mexico. Moreover, the Nery's brand name had been licensed to a Mexican company, Zahava, which in turn was licensed to sell cheese in Mexico. Under the license

agreement with Zahava, Targa retained its cut-and-wrap business and would even cut-and-wrap other cheese brought to Targa by Zahava. The agreement was for several years but contingent upon Zahava meeting sales minimums for Nery's brand cheese.

In March 2008, Nascent borrowed $1 million from Genesis for the purpose of buying cheese for Targa. The capital was also to be used for the purpose of taking Nery's brand nationwide. The loan was evidenced by a written promissory note dated March 31, 2008 between Genesis and Nery's, initially for a six month term and then extended to a one-year term with accrued interest and principal due (115%) (the "Nascent Note"). In March 2009, the Nascent note was again modified and extended. The Nascent Note was secured by all assets of Nascent, including Targa and the Nery's brand.

Sandro Piancone was the Chief Executive Officer of Nascent during this general period of time when Nascent was negotiating with Genesis for the Nascent loan. Piancone also became Director General of Targa and responsible for its overall growth. Piancone first met John Cathcart in 2006. At the time, Cathcart was a mergers and acquisitions consultant who Piancone retained in 2007 for the purpose of assisting Nascent with the acquisition of food service and distribution companies. Cathcart was an experienced businessman with over 25 years in the venture capital and business start-up area. Cathcart also had experience with taking companies public as well as in company buyouts and roll-ups. Piancone and Cathcart did not have any contact after Cathcart's 2007 consulting activities until early 2009 when, in the midst of Nascent's financial difficulties, Piancone reached out to Cathcart for assistance. At that point, Cathcart became more involved with Nascent. By May or June 2009, Cathcart met with Piancone and

4

Nascent board members.[1]  Piancone suggested that Cathcart become a licensee to market Nery's brand cheese in the U.S.  The licensing agreement with Zahava was fully discussed.  Piancone and Cathcart agreed to explore Cathcart's purchase of Targa.  A letter of intent by Cathcart for a $2 million cash purchase of Targa followed Cathcart's inspection of the Targa facility and review of some financials for 2009.  By late 2009, Targa was barely operating at all, and at a loss.  Targa's income was approximately $10,000 to $15,000 a month with monthly expenses at $25,000 to $30,000.  It was apparent to Cathcart that Targa could have shut down its facility and continued receiving royalties and/or restart its cut-and-wrap business.  Moreover, it appeared to Cathcart that Zahava likely could not meet its sales minimums for Nery's brand cheese, which would terminate the licensing rights for Zahava.

It became Cathcart's intention to acquire Targa after concluding he could deal with Zahava, whether Zahava met sales minimums or not.  This decision was based on Cathcart's two to three visits to the Targa plant, Cathcart's discussions with plant manager Christian Alvarez (discussed below), Cathcart's review of the financials which, being unaudited, contained some inconsistencies, and Piancone's representation that there were no more than a few hundred dollars in accounts payable other than the $150,000 to Ex-Im Bank.  Piancone further represented that any accounts payable were stale and not necessary to pay.  Piancone also represented to Cathcart that facility back rent would be forgiven by the landlord in lieu of a new rental agreement.

---

[1]  Following the creation of Nery's U.S.A., Inc., all references to Cathcart and Nery's U.S.A. are interchangeable.

When Cathcart met with Alvarez during one of his plant visits before Cathcart's acquisition of Targa, Alvarez told Cathcart none of the following: That in 2008 to 2009, Targa's revenues were being diverted to other Nascent companies; that Targa's vendors were not getting paid because of this diversion; that taxes and labor expenses were not being paid by Targa for 2009; and that Alvarez was asking Piancone to send checks to pay for these liabilities with the requests being unheeded. Alvarez personally was aware of the approximately $306,000 in unpaid liabilities separate and apart from approximately $285,000 in unpaid taxes due to the Mexican government. Meanwhile, none of this information regarding Targa's financial liabilities was communicated to Cathcart by Piancone or Alvarez.

Cathcart, realizing he could not raise cash to pay off Genesis, negotiated with Genesis to keep its loan in place as a part of a new financing structure. Although Cathcart could only raise $300,000 in operating capital, both he and Genesis agreed it would be sufficient for Nery's to acquire Targa and all its assets from Nascent.

From the beginning, Genesis was informed by Nascent of Cathcart's interest in purchasing Targa and was involved in the negotiations between Nery's and Nascent because Genesis had a security interest in Nascent's assets including Targa. Genesis also knew or should have known, through Nascent and its Portfolio Manager, Tim Doede, that Targa faced a very large rent liability and possible eviction from its facility, that Targa had large tax liabilities pending, and that other significant liabilities and risks existed for Targa.

During the continued negotiations with Nascent and Genesis, Nery's did not offer cash for the Targa stock but instead proposed a $2 million purchase price for

the Targa stock, which was determined by Nascent's representations concerning its debt and Targa's accounts payable that consisted only of: (1) what Nascent owed Genesis, which totaled $1,150,000; (2) $700,000 owed by Nascent on two other loans; and (3) no more than $150,000 in liabilities/accounts payable of Targa at closing. On October 29, 2009, Nery's communicated these terms to Genesis, through Doede.

Nascent's representation that Targa's accounts payable did not exceed $150,000 was material to Nery's because Nery's would not have executed any contract to purchase Targa if the accounts payable exceeded $150,000 beyond the few hundred dollars to which Piancone and/or Alvarez had earlier referred. Nery's refused to pledge any security interest to Genesis as part of the proposed purchase terms. As indicated previously, in November 2009, Nery's also informed Genesis, via Doede, that Nery's could only provide $300,000 of working capital.

In a "Nascent Valuation Memorandum" drafted by Doede and dated January 31, 2010, the following was set forth: "As of the writing of this Valuation, documents that would effectuate the sale of these assets in exchange for the assumption of $2,000,000 in liabilities of Nascent are being finalized. Currently, the business of Targa has been stopped due to a lack of working capital to purchase inventory of cheese and cigarettes for distribution in Mexico. [Nery's] is providing $300,000 of working capital to restart the business . . . the plan for restarting the Targa business is risky, especially with only $300,000 of new capital as identified as of the writing of this valuation."

In the "Nascent Valuation Memorandum," Genesis also recognized that as of January 31, 2010, the amount of the Nascent Note was $1,100,000.

On or about February 10, 2010, Nascent and Nery's executed a Stock Purchase Agreement ("SPA") for the purchase of Targa's stock previously reviewed and approved by Genesis and its legal counsel. On or about February 10, 2010, Nascent and Nery's executed a Stock Purchase Agreement ("SPA") for the purchase of Targa's stock, which included the following material terms, representations, and warranties:

- In Article I of the SPA, Nascent acknowledged that:
  - "Indemnification Acknowledgment" has the meaning set forth in Section 8.3(a)(ii) of the SPA. (SPA at p. 2)
  - Nascent, and any other officer or director of the Targa, refers to actual knowledge that would have been obtained "after reasonable due diligence or inquiry in light of the circumstances." Id. at p. 3.
  - Nery's was entitled to an exclusive remedy of indemnity for "Losses", including damages, costs, liabilities, losses, judgments, settlements, awards, penalties, fines, legal fees, expert fees, costs of investigation, and enforcement and collection costs. Id.
  - A "Material Adverse Effect" on Nery's includes material adverse effects on Nery's' assets, operations, personnel, condition (financial or otherwise) or prospects, or Nery's ability to consummate the transactions contemplated by the SPA. Id.
  - A "Welfare Plan" means any other plan or program maintained for past or present Targa employees, "including without any limitation . . . severance plan . . . vacation pay . . . holiday pay . . . severance . . . excess benefit, bonus . . . salary continuation . . . that are maintained or contributed to by [Targa]."

- In Article II of the SPA entitled "Purchase and Sale," Nascent agreed to transfer the Targa stock to Nery's for a purchase price of $2 million. (Id. at p. 6, ¶2.1, 2.2.)  The purchase price was based on the following:

  o Nascent's representation to Nery's that Targa's accounts payable would not exceed $150,000 and were to be assumed by Nery's. Id. at ¶ 2.2(a)

  o Nery's would execute a note payable to Nascent in the amount of $1,850,000 due and payable on or before August 1, 2011 [18 months after the SPA's effective date].  Id. at ¶ 2.2(b).

- In Article III of the SPA, Nascent and Targa, jointly and severally, made the following representation and warranties as true as a "material inducement" to Nery's to enter into the SPA and consummate the transactions contemplated therein:

  o Targa was not in breach of any contracts.  Id. ¶ 3.4(b).

  o Targa's "books of account and other financial records…are correct and complete in all material respects . . . and have been maintained in accordance with sound business and accounting practices. Each transaction is properly and accurately recorded in the books and records of [Targa].  [Targa] maintains an adequate system of internal accounting controls and does not engage in or maintain any off-the-books accounts or transactions."  Id. at ¶ 3.8(a).

  o Targa did not have any undisclosed liabilities "whether known or unknown, whether direct or indirect, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or

unliquidated, and whether due or to become due, including any liability for Taxes" as no such liabilities were included in any schedule attached to the SPA. <u>Id.</u> at ¶ 3.8(c).

- o Targa's accounts receivable are "collectible in the ordinary course of business." <u>Id.</u> at ¶ 3.10.

- o Targa did not have any labor disputes. <u>Id.</u> ¶ 3.11(d)

- o Targa's Welfare Plans are funded, <u>id.</u> ¶ 3.12(a); no omission has occurred with respect to any Welfare Plan "that could subject [Targa] to any Tax or penalty under applicable Law," <u>id.</u> ¶ 3.12(b); and none of Targa's Welfare Plans have any unfunded liabilities, <u>id.</u> ¶ 3.12(c).

- o Targa has filed all necessary tax returns, that said returns correctly state Targa's tax liability, that Targa has paid all taxes due or made adequate reserves for same, that Targa has no knowledge of any proposed assessment of additional taxes, and that Targa is not being audited and no such audit is pending or threatened. <u>Id.</u> ¶¶ 3.13 (b), (d).

- o There is no pending or threatened "investigation, action, or proceeding" relating to or affecting Targa, its assets, or any officer, director or employee acting in their capacity as such. <u>Id.</u> at ¶ 3.14.

- o "None of the representations or warranties…included in this Agreement… contains any untrue statement of a material fact or is misleading in any material respect or omits to state any material fact." <u>Id.</u> ¶ 3.30.

- In Article VI of SPA entitled "Covenants of the Parties," Nascent agreed to the following:
  - Nascent indemnifies, defends and holds harmless Targa and Nery's from any loss, claim, liability, expense, or other damage attributable to: "all Taxes (or non-payment thereof) of [Targa]" for events occurring before the closing date. Id. at ¶ 6.5(b).
  - All transfer, and other such Taxes and fees (including any penalties and interest) incurred in connection with the SPA must be paid by Nascent.
- In Article VII of SPA entitled "Closing Conditions," Nascent attested that its representations and warranties contained in the SPA "shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date." Id. at ¶ 7.1(a).
- In Article VIII of SPA entitled "Indemnification," Nascent agreed that it shall indemnify, defend and hold harmless Nery's and Targa from and against any Losses arising from or relating to: (i) Any breach of representations and warranties by Targa; (ii) Any breach of the covenants and agreements made by Targa or Nascent; and (iii) Any indemnification obligations related to Taxes. Id. at ¶ 8.1(a).
  - In paragraph 8.3(a)(i), the SPA states that "No failure to give a Notice of Claim shall affect, limit or reduce the indemnification obligations of an Indemnitor . . . ."
  - Indemnification is to be the exclusive remedy for all parties for all claims and in lieu of any contract or tort rights.

- In Article IX of the SPA entitled "Miscellaneous," Nascent agreed to the following:
    - The SPA represented the entire agreement; and "No waiver of any of the provisions of [the SPA] shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided. Neither the failure nor the delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of any such right, power or privilege or the exercise of any other right, power or privilege." Id. at ¶ 9.4.
- The SPA's terms "may be amended only by a written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance." Id. at ¶ 9.6.

At the time Nascent executed the SPA, Nascent knew that Targa's accounts payable exceeded $150,000, and that Targa faced tax liabilities and liens that could freeze Targa's inventories and bank accounts. Nascent also knew that Targa had pending labor disputes and owed its employees bonuses. On or about February 10, 2010, Nery's executed a Promissory Note ("Nery's Note") payable to Nascent in the amount of $1,850,000, with 10% interest per annum as required under the SPA. The Nery's Note incorporated by reference the SPA's terms, as reflected in Paragraph 5, which required Nery's to "strictly" perform in the

manner provided by "any agreement including but not limited to the Stock Purchase Agreement related to this Note."

On or about February 10, 2010, Piancone, on behalf of Targa, executed a "Subsidiary and Affiliate Guarantee" ("Guarantee") for the Nery's Note on behalf of Nascent as the "Lender," which provided that Targa may assert a defense that Nascent committed fraud or misconduct.

Genesis, neither a party to the SPA, Nery's note, nor the Guarantee, executed a Collateral Assignment of Contracts with Nascent. As a result, Genesis was Nascent's assignee entitled to receive payments due by Nery's to Nascent under the Nery's Note until Nascent's obligation under the Nascent Note was satisfied. According to Paragraph 5 of the February 10, 2012 Collateral Assignment of Contracts ("Assignment") executed by and between Nascent, the assignor, and Genesis, the assignee: "[u]ntil all Obligations to [Genesis] have been satisfied by [Nascent] in full, [Nery's] will be instructed to remit payment directly to [Genesis] on behalf of [Nascent] . . . . Any excess funds received by [Genesis] under the Contracts, in excess of the Obligations, shall be remitted back to [Nascent]. . . ." In essence, Genesis stands in the shoes of Nascent with respect to any defense that Nery's may assert under the Nery's note or the SPA.

At the time Genesis executed the Assignment, Genesis knew that Targa faced tax liabilities and liens that could freeze Targa's inventories and bank accounts, and neither Genesis nor Nascent disclosed to Nery's that Targa faced such tax liabilities and liens that could freeze Targa's inventories and bank accounts.

13

On February 10, 2010, Nery's executed a Direction Letter with Nascent, in which it agreed to send payments under the Nery's Note to Genesis directly. Nery's did not have any direct obligation to Genesis.

At the time the SPA was executed on February 10, 2010, Targa's accounts payable exceeded $850,000 in violation of Nascent's representation and warranty at ¶¶ 2.2; 3.8(a), (c) of the SPA. In violation of Nascent's representation and warranty at ¶ 3.10 of the SPA, Nery's was unable to collect on approximately $33,714 in accounts receivable that existed before February 2010. In violation of Nascent's representation and warranty at ¶ 3.11 of the SPA, Nascent failed to disclose that Targa faced labor disputes with multiple Targa employees dating back to 2009. In violation of Nascent's representation and warranty at ¶ 3.12 of the SPA, Nascent failed to disclose that Targa did not fund legally mandated employee vacation and bonus benefits in 2009. In violation of Nascent's representation and warranty at ¶ 3.13 of the SPA, Nascent failed to disclose that Targa faced multiple, large tax liabilities and liens for taxes and fines incurred of approximately $390,000 before February 2010 that threatened to shut Targa's doors. In violation of ¶ 6.5(b) of the SPA, Nascent failed to indemnify and defend Nery's for the tax liabilities and liens it faced on behalf of Targa after Nery's timely advised Nascent in writing and verbally of the obligation. In violation of ¶ 6.7 of the SPA, Nascent failed to pay any transfer taxes related to Nery's purchase of the Targa stock. In violation of ¶ 8.1(a) of the SPA, Nascent failed to defend and indemnify Nery's for the losses caused by Nascent's breach of the representations and warranties.

On February 23, 2010, Nery's learned that Targa was responsible for paying on a $50,000 loan (plus interest) owed to IFS/Robert Piancone. To date, Nery's has paid over $51,900 on this liability.

In March 2010, Nery's received notice that Instituto Mexicano del Seguro Social ("IMSS") and Servicio de Administración Tributaria ("SAT") had threatened to seize Targa's assets and freeze its accounts for unpaid social security benefits from 2009. Targa's liability to IMSS was for over $21,000. This liability remains pending. In March 2010, Nery's also received notice that SAT had threatened to seize Targa's assets and freeze its accounts for unpaid social security benefits and tax liabilities fines from 2009. Targa's liability to SAT totaled over $6,915. After nearly a year of negotiation, Nery's paid this liability in full.

In March 2010, Nery's received notice that INFONAVIT had threatened to seize Targa's assets and freeze its accounts for multiple unpaid housing/withholding taxes and fines from 2006-2009. Targa's liability to INFONAVIT was for over $35,000. After months of negotiations with INFONAVIT, Nery's paid over $30,000 for these liabilities.

In March 2010, Nery's hired attorneys to address the IMSS, SAT and INFONAVIT tax liabilities that threatened to effectively shut down the business. In March 2010, Nery's paid over $15,500 to these attorneys. In all, Nery's has paid over $17,500 to attorneys to address these tax liabilities.

In March 2010, Nery's received notice that Targa failed to pay employee vacation time and payroll bonus for 2009 for $7,775.35. Nery's paid these liabilities in full by June 2010. In March 2010, Nery's hired Targa's former accountant to audit all of Targa's outstanding liabilities.

On or about April 1, 2010, Nery's was informed that Targa owed over $88,000 for rent incurred between February 2009 and February 2010. Nery's made its first monthly payment for over $3,000 on this liability on March 3, 2010 and has paid this liability in full.

On April 6, 2010, Targa's former accountant provided Nery's with an audit of all of the liabilities incurred by Targa before February 2010. According to the audit, Targa had over $370,000 in accounts payable as of February 2010. This $370,000 amount did not include the $50,000 loan to IFS/Piancone, the full amount of outstanding tax liabilities and liens, nor employee labor obligations.

On May 17, 2010, Nery's received notice that Ex-Im Bank demanded $149,250.81 to satisfy a 2009 vendor debt owed by Targa. This liability was included in the April 6, 2010 liabilities audit.

On or about July 30, 2010, Targa received a notice of a $285,000 lien from SAT for customs tax penalties incurred by Targa in 2007. This lien was uncovered and presented to Nery's in September of 2010 by a potential investor, who refused to finance Targa because of this lien. The lien was not removed from the registry until after April 2011.

In August 2010, Nery's was notified of another vendor liability incurred by Targa before 2010 that totaled $52,852. This liability was not included in the April 6, 2010 liabilities audit.

In 2010, Nery's hired an outside accounting firm, Deloitte, to further audit Targa's books and records. Deloitte informed Nery's that under Mexican tax law, if Nascent failed to pay the transfer tax related to the sale of Targa stock to Nery's, Targa would be responsible for the tax liability, which is currently estimated at $500,000. A formal notice was provided to Nery's in January 2012.

The Mexican tax authorities have yet to levy on this tax. This potential liability was not included in the April 6, 2010 liabilities audit or the amount in accounts payable earlier set forth.

On August 24, 2011, Nery's was notified that a judgment for $37,544 was entered against Targa for failure to pay employee severances in 2008 and 2009. This judgment was eventually overruled. To date, Nery's has paid or dismissed over $580,000 in accounts payables incurred by Targa before February 2010.

Nery's kept Genesis informed about the excess in accounts payables both by forwarding documentation of said liabilities and in discussions with Piancone and Alvarez. Nery's substantially complied with any requirement under the SPA to provide written notice and request for indemnification. Nascent, through Piancone, advised Nery's that Nascent was unable to provide Nery's with indemnification. By April 24, 2010, Genesis knew that Targa's accounts payables totaled over $300,000. Genesis also knew about the $285,000 tax lien that prevented Nery's from raising additional capital for Targa. Genesis never offered to indemnify Nery's for Nascent's breaches of the SPA. Nery's made two payments to Genesis, as required by the direction letter, in April and May 2010, for $15,416.47 each. Nery's stopped making payments to Genesis because it needed to address the excess accounts payables and tax liens. In July 2010, Genesis sent Nery's a Notice of Default on the Nery's Note. In a "Nascent Valuation Memorandum" drafted by Doede dated December 31, 2010, Genesis recognized that the excess accounts payable was material, and that Nery's had to address the tax lien. In January 2011, Nery's made another $15,616.47 payment to Genesis, for a total of $46,250.01.

**LEGAL STANDARDS AND CONCLUSIONS OF LAW**

**Breach of Contract**

In order to recover for breach of contract, a plaintiff must plead and prove: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." <u>Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas.</u>, 116 Cal. App. 4th 1375, 1392 (Cal. Ct. App. 2004) (quoting <u>Careau & Co. v. Security Pacific Business Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1388 (1990)); <u>see also</u> Witkin, <u>Summary of Cal. Law</u> (10th ed. 2005) Contracts § 847.

An assignee under a contract "stands in the shoes" of an assignor with rights and remedies subject to the defenses that may be asserted against the assignee by the obligor. <u>See</u> Witkin, <u>Summary of Cal. Law</u> (10th ed. 2005) Contracts § 735 (citing Cal. Civ. Code § 1459).

A material breach of contract provides an injured party a right to damages or the right to refuse further performance. <u>See</u> Witkin, <u>Summary of Cal. Law</u> (10th ed. 2005) Contracts §§ 852-53.

A party to a contract may rescind when:

- that party's consent to the contract was given by mistake or through fraud (Cal. Civ. Code § 1689(b)(1)); or

- a material breach by the other party results in a failure of consideration, total or partial (Cal. Civ. Code § 1689(b)(2)); or

- the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause (Cal. Civ. Code § 1689(b)(4)).

Fraud in the inducement is a misrepresentation involving a contract in which "the promisor knows what he or she is signing but consent is induced by

fraud." <u>McClain v. Octagon Plaza, LLC</u>, 159 Cal. App. 4th 784, 792 (2008) (citing 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 297). "A party may claim fraud in the inducement of a contract containing a provision disclaiming any fraudulent misrepresentations and introduce parol evidence to show such fraud." <u>Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.</u>, 32 Cal. App. 4th 985, 992-95 (1995). Fraud in the inducement renders the entire contract voidable and subject to rescission. <u>See id.</u> at 996.

To establish a rescission claim, the party rescinding the contract must give notice to the other party promptly upon discovering the facts that entitle him to rescind. <u>See</u> Cal. Civ. Code § 1691(a). The rescinding party must also return or offer to return any consideration received from the other party under the contract. <u>See</u> Cal. Civ. Code § 1691(b).

As found above, Genesis stands in the shoes of Nascent, and is subject to the defenses Nery's has against Nascent. The court concludes Nascent materially breached the SPA it entered into with Nery's and, furthermore, the breaches were immediate upon execution of the SPA. The breach was multifaceted, consisting of several failures by Nascent, many of which would serve as an independent basis for breach.

Nascent represented that the accounts payable (interchangeable with "liabilities") did not exceed $150,000. In truth, total liabilities claims exceeded over $800,000, over $550,000 of which were paid or negotiated by Nery's. Within two months of executing the SPA, Nery's first learned of pre-existing liabilities exceeding $300,000 over and above the $149,000 disclosed bank liabilities earlier incurred by Targa to purchase product. The misrepresentations

regarding accounts payable/liabilities by Nascent were grossly negligent,[2] if not reckless, and consisted of a material breach of the contract excusing further performance by Nery's, and independently constituting a basis for rescission.

Nascent further represented in the SPA that all of Targa's accounts receivable were collectible. In truth and in fact, they were not and, under the circumstances of Nery's acquiring Targa on such a precarious basis with only $300,000 cash to resurrect the moribund Targa, this misrepresentation constituted a material breach and was sufficient to justify rescission.

Nascent further represented in the SPA that all labor costs and liabilities were paid and/or fully funded. In truth and in fact, they were not and, given that almost $50,000 was due under the circumstances discussed above, this misrepresentation constituted a material breach and was sufficient to justify rescission.

In addition, Nascent represented that no tax liabilities or liens existed. In truth and in fact, at the time the parties entered into the SPA, approximately $285,000 of such obligations of Targa existed, constituting another grossly negligent or reckless misrepresentation by Nascent which was material at the time of contract formation and sufficient for rescission by Nery's.

Nascent also represented in the SPA that it would defend, indemnify, and hold harmless Nery's for any loss or liability resulting from a breach of any representation or warranty of the SPA. It is fair to say that this promise, so important to Nery's as it provided for Nery's' sole recourse, was itself breached when Nascent was unable to reimburse Nery's for the most minimal undisclosed

---

[2] The court accepts the undisputed evidence the misrepresentation was not intentional.

pre-existing liabilities such as product arrearages to vendors and "front door demands" for past taxes due to be paid in cash.  As Cathcart attempted to pass those bills, statements, and demands for payment directly to Nascent through Piancone and Alvarez, Nascent declared its inability to indemnify in even the smallest amounts.  The misrepresentations related to indemnification were, under the circumstances, unconscionable on the party Nascent, and the indemnification remedy itself totally illusory and fictional.  All of those representations were material and of themselves sufficient to justify rescission.  Further material breaches were committed by Nascent regarding the transfer of taxes due by Targa.

The parties have acknowledged that Nascent's breaches were immediate and material.  It was absolutely clear to Nascent (and Genesis independently) that Cathcart was attempting to restart Nery's with a marginal cash infusion consisting of $300,000 new investor capital, and that knowledge of Targa's undisclosed liability would have precluded Cathcart from proceeding with the acquisition of Targa through Nery's.  The court concludes that any failure of due diligence related to the SPA falls on Nascent's side of the ledger.  Had Nascent been committed to making a good faith assessment of Targa's financial standing before making its unconscionable representations in the SPA, it would have revealed, to one degree or another, Targa's tenuous finances and existing obligations.  The suspicions of Piancone and Alvarez could have easily triggered an accounting (which came a few months later at Cathcart's insistence), which, in turn, would have disclosed more accurately the financial health of Targa.  Nascent could have chosen a caveat emptor stance with Cathcart.  But it did not.  Nascent went on to make representations, warranties, and promises it could neither honor nor keep and did so in reckless disregard of Nery's reasonable expectations under the SPA.

Moreover, the evidence discloses that Cathcart reasonably relied upon the personal representations of Piancone that, aside from the $149,000 back obligations, no other liabilities existed, save and except minimal amounts totaling not more than a few hundred dollars.

Clearly and convincingly, Nascent should have known its missteps were false, unfounded, and of the type that would induce Nery's, through Cathcart, to enter into the SPA to its detriment. Although Nascent was under no duty to counsel Nery's, nor to warn Nery's of the slings and arrows of the cheese business in Northern Baja, Mexico, once Nascent made its representations in the SPA, it was under a duty to avoid making negligent and/or reckless inducements to Nery's.

As set forth above, Nascent materially breached the SPA in several ways, individually and collectively. The breach(es), attributed to Genesis, excuse Nery's from performing under the contract. Genesis, therefore, is not entitled to recover on its breach of contract claim against Nery's or Targa. Nery's is entitled to judgment on Genesis' contract claim as well as reasonable attorney fees, as provided by law in defending this claim.

The court also concludes that Nery's, should it so elect, is entitled to rescind the SPA agreement upon tender of its Targa shares. Such a remedy will result in Genesis receiving Targa's assets. Nery's is entitled to restitution of $46,250 from Genesis representing the earlier payments by Nery's to Genesis under the SPA as well as recoverable interest and attorney fees in favor of Nery's.

### Unjust Enrichment Claim

"[I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment." <u>Janigan v. Taylor</u>, 344 F.2d 781, 786 (1st Cir. 1965). However,

"[w]hen the value of the property held in trust increases significantly because of a defendant's efforts, a constructive trust that passes on the profit of the defendant's labor to the plaintiff usually goes too far." Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 911 (9th Cir. 2010).

Under California law, unjust enrichment is an action in quasi-contract. Paracor Fin. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996). But a claim for unjust enrichment cannot lie "where a valid express contract covering the same subject matter exists between the parties." Gerlinger v. Amazon.com, Inc., 311 F. Supp. 2d 838, 856 (N.D. Cal. 2004).

Here, a valid contract was formed. Moreover, no evidence indicates that Nery's was unjustly enriched. To date, the court finds that Nery's has expended in excess of hundreds of thousands of dollars to liquidate Targa's undisclosed obligations. Although it appears that revenues substantially increased, no evidence indicates that profit levels increased after Nery's' acquisition of Targa. The court therefore concludes that Nery's is entitled to judgment on Genesis' claim of unjust enrichment.

## CONCLUSION

Based on the applicable law, the evidentiary record before the court, and the foregoing analysis with findings, the Court finds in favor of said Defendants and each of them and against Plaintiffs on all claims. Defendants are to prepare a judgment.

**IT IS SO ORDERED.**

DATED: July 26, 2013

Jeffrey T. Miller
United States District Judge

23